```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/8/2021
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------X
EMIL RENSING,                        :
                     Petitioner,    :
                                     :        **19 CV 5674(VM)**
        -against-                    :        **16 CR 442 (VM)**
                                     :        **DECISION AND ORDER**
UNITED STATES OF AMERICA,            :
                                     :
                     Respondent.    :
--------------------------------X
**VICTOR MARRERO, U.S.D.J.:**

On June 23, 2016, a grand jury indicted Emil Rensing ("Rensing") on one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 ("Count One"), and one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2 ("Count Two"). (See "Indictment," United States v. Rensing, 16 CR 442 (the "Criminal Docket"), Dkt. No. 8.) The charges stem from Rensing's transfer of millions of dollars belonging to his former employer for Rensing's personal use. To carry out this scheme, Rensing contracted with and compensated vendors that, in large part, did not provide the services contracted for.

Now pending before the Court is Rensing's motion, pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his sentence in the underlying criminal matter, United States v. Rensing, 16 CR 442, based on ineffective assistance of counsel. (See "Motion," Rensing v. United States, 19 Civ.

05674 (the "Civil Docket"),[1] Dkt. Nos. 1, 2.) In support of the Motion, Rensing filed a memorandum of law ("Rensing's First Memorandum," Dkt. No. 4) and a declaration from Robert J. Hantman ("Hantman Declaration," Dkt. No. 3). The Court also received the Government's first memorandum of law in opposition ("First Government Memorandum," Dkt. No. 19), Rensing's reply memorandum of law in further support ("Rensing's Reply Memorandum," Dkt. No. 5), Rensing's second memorandum of law in support (Dkt. No. 18), and the Government's second memorandum of law in opposition ("Second Government Memorandum," Dkt. No. 20). For the reasons set forth below, the Motion is DENIED.

## I.   BACKGROUND

A.   OFFENSE CONDUCT AND CHARGES[2]

---

[1] Docket entries cited herein refer to the Civil Docket, except as otherwise specified.

[2] Except as otherwise noted, the following background derives from the presentence investigation report, prepared in connection with Rensing's sentencing in which Rensing's objections to two paragraphs are noted. (See "PSR," Criminal Docket, Dkt. No. 36.) The Court has also considered the full record submitted by the parties, including the following frequently cited materials: Hantman Declaration, Exhibit B ("Plea Transcript," Dkt. No. 3-1), Exhibit C ("Sentencing Transcript," Dkt. No. 3-2), Exhibit D ("First Rensing Declaration," Dkt. No. 3-3), and Exhibit E ("First B.Rensing Affidavit," Dkt. No. 3-4); second reply declaration of Robert J. Hantman in further support of Rensing's Motion (Dkt. No. 17), Exhibit A ("Second Rensing Declaration," Dkt. No. 17-1), Exhibit B ("Protass Affirmation," Dkt. No. 17-2), and Exhibit C ("Second B.Rensing Affirmation," Dkt. No. 17-3); Henry E. Mazurek's declaration in opposition to Rensing's Motion ("Mazurek Declaration," Dkt. No. 10); and Exhibit A to the First Government Memorandum ("Plea Agreement," Dkt. No. 19-1). No further citations to the record will be made herein except when specifically quoted.

Beginning in the mid-2000s, Rensing worked as a consultant for Studio 3 Partners LLC, d/b/a "Epix" through his own company, Hot Shoe, Inc. In 2010, Rensing closed Hot Shoe, Inc. and accepted a full-time position at Epix as chief digital officer. In this position, which he held from 2010 until August 2015, Rensing managed the technology Epix used to provide digital content to its customers via electronic devices. In connection with this work, Rensing identified and retained most of the vendors Epix contracted to provide services to the company's digital department.

As relevant here, Rensing was the sole owner of two media content service providers, Streaming Media Services, Inc. ("Streaming Media") and AMP Digital[3] ("AMP"), both of which contracted to provide digital services to Epix. According to the Indictment, Rensing defrauded Epix of over $8 million by engaging these vendors to provide services that were "in large part, never performed," using the names and contact information for purported vendor employees who in fact "had never heard of the vendors or performed services for [Epix]." (Indictment ¶ 3.)

    1. <u>Streaming Media</u>

---

[3] The PSR identifies Vendor-2 as "Massive Projects Digital IV, Inc." (PSR ¶ 12.) However, both parties' submissions along with other materials filed in connection with this matter identify Vendor-2 as "AMP Digital." Accordingly, the Court refers to this entity as "AMP," but notes the discrepancy here for clarity.

In particular, records related to the contract with
Streaming Media showed that, while Rensing was not listed as
the vendor contact and the email address provided did not
appear to be associated with him, Rensing was in fact
communicating through that address. For example, the
"recovery email" for Streaming Media's listed email account
began with "emilr" and was registered to Rensing at his home
address in New York. Moreover, the email account was accessed
from an IP address registered to Rensing at his residence,
and the phone number associated with Streaming Media's email
account was also registered to Rensing. The Federal Bureau of
Investigations ("FBI") also learned that regular
communications from Streaming Media's email account to Epix
regarding administrative matters were sent by Rensing
himself.

Not only did the investigation reveal that Rensing was
behind communications appearing to be from Streaming Media,
but he also used the identities and contact information of
several unknowing individuals to conceal his involvement. For
example, the signature on the Form W-9 submitted to the
Internal Revenue Service ("IRS") on behalf of Streaming Media
belonged to someone with whom Rensing had previously worked,
but who had not heard of Streaming Media, had not signed the
Form W-9, and had not rendered any services to Epix. That

same person's signature was again forged on the 2011 Services Agreement with Epix as the president of Streaming Media without the person's knowledge. Moreover, the 2014 Master Services Agreement with Streaming Media was signed by another individual who similarly had never heard of the vendor, had not signed the agreement, and had not provided any services to Epix. This same individual's signature appeared on Statements of Work related to contracts with AMP, but again, this person had not signed the statements and had not provided any work for Epix. Furthermore, several Statements of Work also listed individuals with whom Rensing had previously worked but who had never heard of Streaming Media and had not provided Epix any services. Other individuals listed not only had not heard of Streaming Media or provided Epix any services but had never even heard of Rensing.

Invoices submitted by Streaming Media between November 2010 and September 2014 showed that Epix paid Streaming Media $8,560,752. (PSR ¶ 20.) On November 10, 2010, a bank account, for which Rensing was the sole signatory, was opened in the name of Streaming Media, listing Rensing as the president. The bank records showed that no payments were made from that account to any of the purported key personnel listed on the Statements of Work. Payments were made from the account to a payroll company whose records showed that of the eighteen

individuals listed as key personnel at Streaming Media, only one person was paid a total of $32,577 and $18,090 in 2013 and 2014 respectively. (PSR ¶ 27.)

    2. AMP

In September 2014, Epix management indicated that all relationships with vendors related to Epix employees should be terminated. Consistent with that directive, Epix's last invoice from Streaming Media was paid on September 18, 2014. It was at this point that Rensing began to use AMP to further his scheme.

Bank records revealed that between December 2014 and May 2015, Epix paid AMP a total of $398,620. (PSR ¶ 37.) The FBI investigation uncovered that, as with Streaming Media, Rensing was the true actor behind communications from AMP to Epix and the true recipient of funds Epix paid to AMP. At least three invoices AMP submitted to Epix were sent via an IP address registered to Rensing at his residence. Bank records listed AMP's account name as "Emil Rensing International, Inc.," an entity solely controlled by Rensing. Epix's payments to AMP were made to another account, also in the name of "Emil Rensing International, Inc."

As was the case with Streaming Media, AMP records listed purported employees who were not familiar with the vendor and who had not provided services to Epix. For example, one

document showed the designated contact person for AMP was a personal acquaintance of Rensing who had neither heard of the vendor nor performed any services for Epix. The email address for this contact person contained his initials, but records related to the account suggest that Rensing was the true account user. Likewise, a phone number listed for this person was registered to Rensing. This person was also listed as project manager for certain services AMP was to provide, despite having no relationship with AMP or Epix.

Similarly, an individual listed as vice president of AMP was a former colleague of Rensing who had neither heard of AMP nor performed any services for Epix. This individual's signature also appeared on an IRS Form W-9, the 2014 Master Services Agreement, and six Statements of Work, none of which this person actually signed.

Records further revealed that various Statements of Work listed individuals as key personnel who had likewise neither heard of AMP nor provided any services to Epix. In one email dated March 24, 2015, a purported project manager emailed Rensing referencing two other key personnel. Rensing forwarded the email to Epix's in-house attorney to identify AMP's contacts, but the FBI contends that according to its investigation, Rensing was the true author of the forwarded message.

In late March or early April of 2015, an Epix manager attempted to visit the offices of AMP at the address listed. However, the reception employees at the address were unfamiliar with AMP. When the manager confronted Rensing about this, Rensing explained that AMP was going through a "rebranding." When the manager visited a second time, this time with an Epix financial analyst, the manager observed, on the door of the suite allegedly belonging to AMP, a sign for an internet-based video newscast company owned by Rensing.

3. Rensing's Account

Rensing has repeatedly stated that when he joined Epix, he realized "he could not accomplish the things requested of him and his new division . . . with the limited resources provided." (PSR ¶ 52.) To overcome this obstacle, he created new consulting companies for which there was greater resource flexibility. Rensing has stated that when he explained the idea to top management at Epix, they had no objection. He has further explained that reliance on third-party vendors to circumvent resource limitations was common practice at Epix. According to Rensing, top management at Epix used Streaming Media as its own "piggy bank," paying for services that would not otherwise be authorized.[4] (Id. ¶ 54.)

---

[4] Various other submissions reiterate these claims. For example, Rensing repeats that Epix suffered from resource limitations and it could only succeed if "alternative methods" were created to "circumvent Viacom's

Despite this apparent defense of his conduct, Rensing has also indicated that he acknowledged and regretted that he "exploited his relationship at Epix." (PSR ¶ 53.) According to Rensing, it was inaccurate that Streaming Media had performed "little to no work," and that "[w]hile the work was largely not performed by those persons listed . . . Rensing personally performed much of the work and hired temporary workers to help."[5] (Id.) However, Rensing acknowledged that "he should not have been twice compensated for work he performed, since he had an employment contract with Epix." (Id.)

B.   PLEA AGREEMENT AND ALLOCUTION

Rensing was arrested on April 26, 2016. At his arraignment, he entered a plea of not guilty. Throughout his criminal proceeding, up to and including sentencing on June

_____

interference." (First Rensing Declaration ¶ 8; see also Hantman Declaration, Ex. A at 3-4; First B.Rensing Affidavit ¶ 30.) Rensing insists that his conduct was necessary for Epix's success, known to senior management, and ultimately good for Epix, which became a leader in the industry because of Rensing's work. (See First Rensing Declaration ¶¶ 10-18; Hantman Declaration, Ex. A at 5-6.) Because the details of these allegations are not relevant to Rensing's ineffective assistance of counsel claim, only a brief overview is provided herein. Likewise the Court considers immaterial and will not address Rensing's claims related to Epix's purportedly dubious motivations for initiating the internal investigation that ultimately resulted in criminal charges against Rensing. (See Hantman Declaration, Ex. A at 1-2; First B.Rensing Affidavit ¶¶ 25-26.)

[5] The Court notes that this testimony is contradicted by a former vice president for Epix who reviewed invoices from Streaming Media and explained that the services listed were performed by Epix employees or vendors, not Streaming Media. (PSR ¶ 25.)

1, 2018, he was represented by Henry E. Mazurek ("Mazurek"), a private attorney.

On June 20, 2017, Rensing entered a plea agreement with the Government in which he agreed to plead guilty to Count One of the Indictment and admitted the forfeiture allegation with respect to Count One for a sum between $7,143,163.32 and $8,101,466.04. (See Plea Agreement at 1-2.) The parties also stipulated to a Guidelines range of fifty-one to sixty-three months' imprisonment, but the Plea Agreement also indicated the parties' understanding that the sentence to be imposed was to be "determined solely by the Court." (Id. at 3-4.) As part of the Plea Agreement, Rensing further agreed he would not file a direct appeal or a collateral challenge under 28 U.S.C. § 2255, but he maintained his right to assert a claim for ineffective assistance of counsel.

Accordingly, Rensing pled guilty to Count One of the Indictment before Magistrate Judge Cott. (Criminal Docket, Dkt. No. 27.) At the plea hearing, after being placed under oath, Rensing stated that he was satisfied with the representation provided by his counsel. (Plea Transcript at 5:17-23.) Rensing further stated that he and his attorney had discussed the consequences of pleading guilty, that he was ready to plead to Count One, and that he understood the charge and the associated penalties. Rensing stated that he

understood his right to plead not guilty and go to trial. Likewise, he understood that by entering a guilty plea, he was giving up certain rights, including the right to go to trial. Moreover, when asked whether "any force" or "threats of force" had been used to influence his decision to plead guilty, Rensing answered, "No, your honor." (<u>Id.</u> at 11:3-6.) The following exchange also took place:

> THE COURT: Now, I have before me a letter dated June 16th, 2017 from the government to your attorney containing a plea agreement. Have you read the letter?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Did you sign it on the last page?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Before you signed it, did you discuss it with your attorneys?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Did they explain to you all of its terms and conditions?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Apart from what's contained in the letter, have any promises been made to you in order to get you to plead guilty?
>
> THE DEFENDANT: No, your Honor.

(<u>Id.</u> at 11:7-22.) Lastly, when asked whether his plea was made of his own free will, Rensing answered in the affirmative. On the basis of his responses and demeanor, Judge

Cott found that Rensing was "fully competent to enter an informed plea," that he understood "the nature of the charge and the consequences of his plea," and that his plea was voluntary and supported by a factual basis. (Id. at 17:14-19.) This Court accepted the guilty plea on July 26, 2017. (Criminal Docket, Dkt. No. 30.)

C.   MAZUREK'S REPRESENTATION

1. Investigation of Facts and Witnesses

According to Rensing, Mazurek never interviewed any key witnesses and only made a "halfhearted effort" to track any of them down. (First Rensing Declaration ¶ 24.) In the case of the Government's alleged "key grand jury witness," for example, Rensing claims that the witness later told Rensing that he was "tricked" into his Grand Jury testimony, but that despite this lead, Mazurek did not follow up. (Id.) Likewise, on January 11, 2017, Variety magazine published a story about Rensing's case, and according to Rensing, Mazurek failed to investigate a statement quoted from Epix's former CEO Mark Greenberg ("Greenberg") that "the $8.5 million figure cited in the federal government's complaint likely includes some legitimate expenses." (Id. ¶ 31.) Rensing insists this statement is true and Mazurek would have determined as much had he investigated it. Rensing acknowledges that Mazurek did question Epix's former CEO on a conference call on April 23,

2018 but notes that the call took place after Rensing pled guilty, and insists that during this call, Mazurek received additional exculpatory information that he failed to investigate or use.

Rensing's father, Bruce Rensing ("B.Rensing"), stated that when he asked Mazurek whether Mazurek could subpoena potential witnesses, Mazurek stated there was no way to compel someone to be deposed or take the stand. According to B.Resning, Mazurek also stated he would not have access to the Government's witness list until two weeks before trial, which would not be enough time to adequately prepare the case.

For his part, Mazurek explains that he comprehensively reviewed all of the Government's discovery and used it to question "approximately a dozen witnesses associated with the EPIX digital media group." (Mazurek Declaration ¶¶ 7-8.) Mazurek states that these witnesses -- including former Epix CEO Greenberg -- provided valuable insight regarding how Rensing was able to "bill, approve and obtain payments from Epix for more than $8 million," and who provided which services and products. (Id. ¶ 8.) According to Mazurek, he interviewed several Government witnesses who confirmed that, though their names appeared on Epix contract materials, they did not work for Streaming Media or AMP and had not provided Epix any services. Mazurek further asserts that he

interviewed Rensing's accountants, who explained how expenses were directed and allocated to Streaming Media and AMP.

Harlan Protass, an attorney who represented Rensing in connection with the forfeiture issues, submitted an affidavit in support of Rensing's Motion. The Protass Affirmation details the April 23, 2018 teleconference in which Greenberg said (1) he knew Rensing owned Streaming Media, though he ultimately asked Rensing to end his relationship with Epix because of the potential conflict; (2) Epix permitted Rensing to use Streaming Media to circumvent red tape; (3) Rensing was an efficient employee; and (4) Greenberg felt bad that Rensing had pled guilty to an $8.1 million fraud. Greenberg further explained that Rensing did not have "carte blanche" to do whatever he wanted, and the notion that Rensing could justify his compensation because of his work and efficiencies was "ridiculous." (Protass Affirmation ¶ 7.)

2. <u>Consideration and Use of Defenses</u>

Rensing states that he informed Mazurek that despite the allegations against him, Streaming Media actually did deliver value to Epix. Rensing insists that because Mazurek did not "comprehend" the technical evidence, Mazurek ignored the evidence that supported this proposition. (First Rensing Declaration ¶¶ 21-23.) Moreover, according to Rensing, when Rensing offered to help Mazurek by participating in witness

calls to explain any technical jargon, Mazurek refused. Rensing further claims that Mazurek failed to "represent the value of clearly identifiable expenses" Epix paid to Streaming Media. (Id. ¶ 30.) Rensing contends that he repeatedly explained that Mazurek's plan to follow the money trail would not work to prove Rensing's innocence, and that instead Mazurek should have focused on the "work output, services, deliverables and the dysfunctional environment." (Id. ¶ 26.) Despite Rensing's repeated pleas, Rensing claims, Mazurek was solely focused on the payment records.

Rensing also asserts that he asked Mazurek to give the FBI various passwords to access his cell phone and computer, both of which the FBI had seized, but that Mazurek refused. B.Rensing likewise claims that the FBI was not able to "crack the passwords for Emil's computer and cell phone," and therefore lacked the full picture of the relevant email history. (B.Rensing Affidavit ¶ 12.)

B.Rensing adds that Mazurek told him he could not show who performed the work Streaming Media provided to Epix, despite Rensing's explanation that he provided most of the work himself. B.Rensing further stated that he explained how the data on Streaming Media's server could substantiate this claim, but that Mazurek was not interested. Instead, B.Rensing maintains, Mazurek explained that the identity

theft charged in Count Two carried a two-year mandatory term of imprisonment and that he did not have a defense for that conduct. But B.Rensing states that he told Mazurek "not to waste time on the identify [sic] theft" and focus on proving no money was stolen. (First B.Rensing Affidavit ¶ 11.) B.Rensing adds that if they had the email addresses of the alleged victims, they could have offered explanations, though he does not detail what those explanations would have been. B.Rensing further suggests, without elaborating, that the fact that a Virtual Private Network ("VPN") was in use was further exculpatory information that Mazurek ignored.

Mazurek responds that in his professional opinion, it would have been difficult to succeed at trial given the quality and volume of the Government's evidence. Moreover, Rensing would have to concede that records related to the agreements between Epix and Streaming Media and AMP contained numerous false statements. Mazurek states that he explained to Rensing that even if Rensing did much of the work he billed to Epix, that would not constitute a complete defense. The records that work was performed by Streaming Media and AMP employees were "materially false," whether or not Rensing did the work himself. (Mazurek Declaration ¶ 12.) Likewise, though Rensing claimed that Epix executives were aware of his conduct, this argument was undermined by the fact that Rensing

lied about owning AMP when he was interviewed as part of Epix's internal investigation.[6] In other words, Rensing's efforts to conceal his role at AMP undermined his claim that his managers condoned the relationship.

    3. <u>Decision Not to Proffer</u>

According to Rensing, Mazurek promised that Rensing could meet with the Government to discuss the case, but when the time came to have the meeting, Rensing was excluded from participating. Thus, Rensing claims that the first time he was permitted to speak with the Government was at his sentencing.

Mazurek explains that he told Rensing that had Rensing wanted to cooperate with the Government, he would have the right to proffer. However, Rensing stated he was not interested in pursuing a cooperation agreement. Moreover, Mazurek explained to Rensing that directly proffering with the Government would expose Rensing to further criminal

---

[6] Rensing argues in his second declaration that he did not own AMP and suggests that Mazurek's continued confusion on this point further underscores his ineffectiveness. However, the Government argues that the evidence showed that Rensing was the sole owner of AMP, and his repetition of the lie "should be considered in assessing the credibility of Rensing's allegations." (Second Government Memorandum at 11-12.) Rensing's bald statement that he did not own AMP is contradicted by extensive evidence that he owned AMP's bank accounts, that AMP's listed address was the same as another of Rensing's companies, and that AMP's phone number was registered to Rensing. (PSR ¶¶ 30, 40, 41.) Whether he "owned" AMP as a technical matter does not affect the evidence that he was intimately associated with AMP and controlled its business affairs. His statements to the contrary thus undermine his credibility before the Court.

charges if the Government had information that could
contradict Rensing's account. By Mazurek's account, Rensing
told Mazurek at the time that he understood this.

#### 4. Presentation of Mitigating Factors at Sentencing

B. Rensing argues that Mazurek did not make use of the
ninety character witnesses available to testify on Rensing's
behalf. However, Mazurek points out that he did prepare an
extensive sentencing submission, including over fifty
letters. Mazurek recommended that Rensing retain a mitigation
specialist and a forensic psychologist, which he did. Both
completed work that was presented at sentencing regarding
Rensing's educational, social, and family history, as well as
the psychological impact of his divorce, sister's suicide,
and Immune Thrombocytopenia.

#### 5. Advice and Consultation Regarding the Guilty Plea

Despite his statements to the contrary during the plea
hearing, Rensing now argues that he "pled guilty under duress,
and was coerced to do so." (First Rensing Declaration ¶ 35.)
In particular, Rensing explains that Mazurek promised him
that he would be sentenced to a term lower than the Guidelines
range, and he pled guilty on the basis of this promise,
believing he had no other options.

Rensing further states that he disputed the stipulated
loss amount because Epix did receive the services for which

it paid. According to Rensing, despite these objections, Mazurek said that the stipulated loss amount did not matter and could be negotiated after the plea was entered and that restitution could also be settled "in the future." (First Rensing Declaration ¶ 37.) Mazurek also failed, according to Rensing, to remove one-third of what were clearly delineated as operational expenses that should not have been included in the loss amount. Had Mazurek not "constantly overwhelmed" him with fear and anxiety, Rensing insists he would not have pled guilty. (Id. ¶ 40.) Rensing further argues that a medical condition he had -- Idioathic Thrombocytopenia Purapura -- caused him to focus on his health rather than his legal issues, which in turn compelled him to plead guilty based on Mazurek's assurances.

In addition, B.Rensing asserts that Mazurek said he knew the Government attorney assigned to the case and could work with her. B.Rensing asserts that he later heard that Mazurek told a third-party that he considered the Government attorney a "snake." (Second B.Rensing Affirmation ¶ 18.) B.Rensing alleges that Rensing would not have plead guilty had he known that characterization represented Mazurek's view of the assigned Government attorney. B.Rensing also stated that Mazurek called B.Rensing to ask him to encourage Rensing to take a plea, though B.Rensing declined to do so.

In large part, Mazurek denies these claims. He explains that he attended numerous meetings with the prosecutor assigned to Rensing's case and his supervisors, including the joint chiefs of the United States Attorney's Office, in negotiating the plea. Ultimately, the Government agreed to dismiss Count Two, which carried a two-year minimum, and to not seek an upward adjustment under U.S.S.G. § 2B1.1 for causing substantial financial hardship. Mazurek states that he presented the offer to Rensing and explained it at length, including the consequences of pleading guilty and the uncertainty surrounding the ultimate sentence. Mazurek insists that he never indicated to Rensing that he could obtain a sentencing recommendation from the Government apart from what is contained in the Plea Agreement, nor did he state that Rensing could not address the Court directly, which in fact he did at the time of sentencing.

After reviewing financial records closely with Rensing, Mazurek declares, he negotiated a reduced restitution amount from approximately $8.1 million to $7.7 million, arguing that roughly $400,000 in payments from Epix to Streaming Media and AMP were legitimate. Mazurek explains he could not obtain any further reduction, however, because the financial records indicated that most of the payments went to Rensing's "car

businesses and personal expenses." (Mazurek Declaration ¶ 21.)

D.   <u>PROCEDURAL HISTORY</u>

The Complaint against Rensing was filed on April 22, 2016. That same day, an arrest warrant was issued, and Rensing was arrested a few days later on April 26, 2016 and released on bail. On June 23, 2016, Rensing was indicted. At arraignment, he pled not guilty.

Almost a year later, in a letter dated June 16, 2017, Rensing entered a plea agreement with the Government. Consistent with the terms of that agreement, on June 20, 2017, Rensing pled guilty to Count One in magistrate court. The plea was accepted by this Court on July 26, 2017.

On June 1, 2018, this Court sentenced Rensing to fifty-one months of imprisonment, three years of supervised release, a $100 assessment, and restitution in the amount of $7,774,469.52. (<u>See</u> Criminal Docket, Dkt. No. 77.) This sentence was on the low end of Rensing's Guidelines range.

On June 18, 2019, Rensing filed the instant motion under 28 U.S.C. § 2255 seeking vacatur of his guilty plea and sentence. (<u>See</u> Motion.) The Government filed an opposition on August 30, 2019, and Rensing filed a reply on September 23, 2019.

On November 7, 2019, the Court held that an evidentiary
hearing was not necessary, but that additional evidence might
be helpful in deciding the motion. (See Criminal Docket, Dkt.
No. 100.) Accordingly, the Court granted the parties time in
which to submit additional material, including an affidavit
from Mazurek. By letter dated March 9, 2020, the Government
submitted an affidavit from Mazurek consistent with the
Court's order. (See Criminal Docket, Dkt. No. 104.)

Rensing filed a supplemental memorandum of law on June
4, 2020, with additional materials in support. The Government
filed a memorandum of law in opposition to Rensing's
supplemental memorandum on July 6, 2020.

E.    THE PARTIES' ARGUMENTS

Rensing argues that his trial counsel's failures
amounted to ineffective assistance of counsel because they
were unreasonable, and but for these alleged errors, Rensing
would not have entered the Plea Agreement and would have
insisted on going to trial. Rensing does not deny that he
used the identities of numerous individuals without their
knowledge or consent to facilitate payments from Epix to
Streaming Media, of which he was the sole owner. However, he
argues that this conduct was required to navigate the
"dysfunctional" environment at Epix, where Rensing could not
accomplish his goals with "the limited in-house resources"

available. (Rensing's First Memorandum at 3.) He states that former Epix CEO Greenberg and Epix's in-house counsel, Monty Sarhan, were both aware of this approach and that the use of outside consultants to circumvent red tape at Epix was common. Lastly, Rensing insists that Epix received the services for which it paid, which were, for the most part, performed by Rensing himself. Rensing contends that trial counsel's failures to investigate the dysfunctional dynamic at Epix, the authorization Rensing had from Epix management to operate as he did, and the fact that the paid-for services were ultimately provided amounted to ineffective assistance of counsel. Rensing additionally argues that because of these failures, trial counsel told Rensing he had no defense and induced Rensing to plead guilty on the false promise that he would negotiate a lower sentence after the plea was entered. Rensing adds that he would have obtained a lower sentence had trial counsel brought all the relevant facts to the Court's attention.

The Government counters that Rensing's Motion fails both because he waived his right to bring the Motion and because he has not established entitlement to relief under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). The Government contends that Rensing's statements regarding trial counsel's ineffectiveness are undermined by his sworn statement at the

plea hearing that he was satisfied with his representation. Furthermore, the Government points out that Rensing has not addressed the "overwhelming evidence that he repeatedly used stolen identities and fake signatures" in order to "convert[] millions of dollars of Epix funds to his own use." (First Government Memorandum at 1.)  The Government argues that trial counsel's investigation was reasonable. According to the Government, Rensing has failed to establish prejudice because he has not shown how any further investigation would have made it reasonable for him to reject the Plea Agreement and go to trial, especially because the Plea Agreement allowed him to avoid a mandatory two-year term of imprisonment. Lastly, the Government contends that Rensing's unsupported and conclusory claims that trial counsel coerced him to plead guilty cannot be credited because they are directly contradicted by his sworn statements at the plea hearing.

## II.   LEGAL STANDARD

Under 28 U.S.C. § 2255, a "prisoner in custody" may petition "the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255 (a). Relief under Section 2255 may be granted "for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in complete miscarriage of justice.'"

Graziano v. United States, 83 F.3d 587, 590 (2d Cir. 1996) (citation omitted). On a Section 2255 motion, "the movant bears the burden of proof by preponderance of the evidence." Hill v. United States, No. 11 CR 145, 2014 WL 104565, at *3 (S.D.N.Y. Jan. 7, 2014) (citing cases).

### III.   DISCUSSION

A.   INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on an ineffective assistance of counsel claim, a movement must establish (1) "that counsel's representation was unreasonable" and (2) "that, but for counsel's incompetence, there is a reasonable probability that 'the result of the proceeding would have been different.'" United States v. Accolla, 253 F. App'x 154, 154–55 (2d Cir. 2007) (quoting Strickland, 466 U.S. at 688, 694).

Under the first prong, a movant will succeed by demonstrating that counsel's representation fell below "prevailing professional norms." Strickland, 466 U.S. at 688. There is a "strong presumption that the assistance rendered by an attorney is objectively reasonable." Guzman v. United States, No. 11 Civ. 2433, 2011 WL 6097128, at *5 (S.D.N.Y. Dec. 7, 2011) (citing Roe v. Flares-Ortega, 528 U.S. 470, 477 (2000) ("[J]udicial scrutiny of counsel's performance must be highly deferential.")).

To succeed under the second prong, a movant must show "that the deficient performance prejudiced the defense." United States v. Poitevien, 269 F. App'x 15, 16 (2d Cir. 2008) (quoting Strickland, 466 U.S. at 668). In other words, the movant must establish that "the result of the proceeding would have been different" but for counsel's deficient representation. Strickland, 466 U.S. at 694. In the context of guilty pleas, "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. 356, 372 (2010) (citing Flores-Ortega, 528 U.S. at 486).

As a threshold matter, the Court concludes that Rensing did not waive his right to file the instant Motion. Though Rensing agreed in the Plea Agreement that he would not file a collateral challenge under Section 2255, the Plea Agreement does not prevent him from bringing an ineffective assistance of counsel claim related to his decision to plead guilty. See Frederick v. Warden, 308 F.3d 192, 195 (2d Cir. 2002) ("[A] waiver of appellate or collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured, here, the plea agreement."). Furthermore, the Plea Agreement expressly contemplated that Rensing would maintain his right to assert a claim for ineffective assistance of counsel. (Plea Agreement at 4

("Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights defendant may have to assert claims of ineffective assistance of counsel.").)

Nevertheless, on the merits, the Court denies the Motion because Rensing has failed to show that Mazurek's representation was unreasonable and that but for such alleged deficiencies, Rensing would have insisted on going to trial.

1. Reasonableness of Mazurek's Representation

Rensing has not shown that Mazurek's performance fell below reasonable, professional standards. First, with respect to Mazurek's allegedly inadequate investigation, Rensing primarily argues that Mazurek did not interview enough witnesses. While it is clear that Mazurek did not conduct the number of witness interviews Rensing now insists was necessary, Rensing's own submissions confirm that Mazurek did question numerous witnesses.[7] Rensing has not provided any evidence suggesting that Mazurek's failure to question more witnesses was unreasonable, and the Court will not require trial counsel to question every possible witness without some indication of whether the additional witness's testimony

---

[7] Mazurek states his team interviewed "approximately a dozen witnesses." (Mazurek Declaration ¶ 8.) B.Rensing argues that instead Mazurek interviewed only 8. (First B.Rensing Affidavit ¶ 14.) Whatever the exact number, the record makes clear that Mazurek interviewed several witnesses.

would be unique, compelling, and material. Fundamentally, Rensing claims that trial counsel's investigation could have been "more vigorous," but such judgmental contention is not enough to make out a claim for ineffective assistance of counsel. See, e.g., United States v. Montilla, 85 F. App'x 227, 231 (2d Cir. 2003) ("To the extent that defendant argues that defense counsel could have 'conducted more vigorous pre-trial discovery,' such claims do not 'establish the ineffectiveness of trial counsel.'" (quoting United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987))).

Nor is the Court persuaded by Rensing's argument that Mazurek failed to interview "key witnesses" in particular. (See Rensing's Reply Memorandum at 5-6.) As an initial point, the record does not support this claim. For example, B.Rensing alleged that Mike Starkenburg and Marc Goldberg were important witnesses because they had told the FBI that they were paid by Streaming Media for work they performed for Epix. Mazurek interviewed them both. Second, even with respect to the "key witness" Mazurek did not interview, Rensing's claim fails. Rensing identifies someone he contends was the Government's key witness in the Grand Jury but who later told Rensing that he wanted to help him. Rensing cannot carry his burden with this evidence, however, because he has not alleged what this witness might have said or how his testimony would

28

have been different from the testimony of those witnesses
Mazurek did interview. Without such allegations, the Court
cannot conclude that it was objectively unreasonable for
Mazurek not to question this particular witness, or any of
the other alleged "key witnesses." This principle applies
even more to former Epix CEO Greenberg, who Mazurek
interviewed after the plea had been entered. Rensing's own
submissions indicate that Mazurek attempted to interview
Greenberg, but that getting a hold of Greenberg was especially
difficult. When Greenberg was finally interviewed by Mazurek,
he did not provide any new information, much less exculpatory
information.

Likewise, the Court is unpersuaded by Rensing's argument
that Mazurek erroneously "followed the money trail," and
should have instead investigated how Streaming Media actually
provided services to Epix. While B.Rensing thought it was a
"waste" of time to focus on the identity theft allegations
(First B.Rensing Affidavit ¶ 11), it was reasonable for
Mazurek to focus on this claim because Count Two carried a
mandatory two-year term of imprisonment. Moreover, the fact
that Streaming Media may have provided some services to Epix
would not have served as a complete defense to either count.
Nowhere in Rensing's submission does he deny that Rensing or
business entities he apparently controlled used the names and

signatures of numerous individuals without their knowledge to facilitate payment for services that were not performed by any of those individuals. Thus, Mazurek's decision to "follow the money trail" did not fall below reasonable professional standards.

Nor has Rensing shown that Mazurek failed to investigate whether certain of the payments from Epix to Streaming Media and AMP may have been legitimate. To the contrary, Rensing's own submissions indicate that Mazurek did ask witnesses and Rensing himself questions related to the services the vendors provided. And through negotiation with the Government Mazurek was able to reduce the restitution amount from approximately $8.1 million to $7.7 million based on roughly $400,000 worth of legitimate payments to Streaming Media and AMP. (Mazurek Declaration ¶ 21.) Thus, Mazurek understood -- and indeed argued -- that some of the money Epix paid to the vendors was legitimate. Rensing's submissions do not establish that the reduction amount was insufficient, nor does the Court have any basis to conclude as much.

As the Supreme Court has explained, the "decision not to mount an all-out investigation" is reasonable when the additional information available would not have been helpful. Burger v. Kemp, 483 U.S. 776, 794-95 (1987) (citing Strickland, 466 U.S. at 690-691). The Court is satisfied that

Mazurek engaged in a reasonable investigation under the circumstances. He reviewed the Government's discovery and interviewed numerous witnesses -- including Epix employees, Government witnesses, and accountants -- to understand Epix's relationship with Streaming Media and AMP, and the strength of the charges Rensing faced. Rensing has not established how further investigation would have provided any unique and "fruitful" information, and he thus has not shown that Mazurek's investigation fell below professional standards. Wiggins v. Smith, 539 U.S. 510, 525 (2003) (explaining "limited investigations into mitigating evidence [is] reasonable" when further investigation would be "counterproductive" or "fruitless") (citations omitted).

Rensing has further failed to establish that Mazurek acted unreasonably in deciding not to turn over Rensing's passwords and server to the FBI or have Rensing proffer with the Government. Rensing states that turning over his passwords "would have helped my case" (First Rensing Declaration ¶ 27), but without more information, the Court cannot conclude that Mazurek's decision not to turn over such wide-ranging, personal data was unreasonable. Nor does Rensing's desire to "explain" his conduct to the Government establish that Mazurek's failure to arrange a proffer fell below professional standards. Mazurek determined that having

Rensing proffer would involve "tremendous risk" because it would require Rensing to take responsibility for his criminal conduct and might expose him to further charges. (Mazurek Declaration ¶ 15.) The Court finds this explanation to be supported by reasoned, strategic considerations. See, e.g., FNU LNU v. United States, No. 12 Civ. 7897, 2015 WL 5893723, at *7 (S.D.N.Y. Oct. 7, 2015) (concluding that a trial attorney's advice to his client to attend a proffer session was "strategic"); see also Cox v. Donnelly, 387 F.3d 193, 198 (2d Cir. 2004) (explaining that a strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client").

Furthermore, the Court does not find that Mazurek's advice with respect to the Plea Agreement was unreasonable. When advising a client on whether to accept the terms of a plea offer, "counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000) (citation omitted). Mazurek states that he did all these things, and Rensing confirmed as much at the plea hearing. (See Plea Transcript at 5:17-6:4.)

But Rensing's argument is not that Mazurek failed to
discuss the terms of the plea offer, the strength of the case
against him, or the consequences of pleading guilty. Instead,
Rensing's claim stems primarily from his allegation that
Mazurek said he would "negotiate a lower sentence and lower
restitution," and "Mazurek pressured and made false promises"
to induce Rensing to plead guilty. (First Rensing Declaration
¶¶ 35, 37.) But these self-serving, conclusory statements are
directly contradicted by his sworn statements at the plea
hearing that no "force" had been used to influence his
decision, and no "promises had been made" in order to get him
to plead guilty (Plea Transcript 11:3-22). See Brown v. United
States, 637 F. Supp. 2d 212, 223 (S.D.N.Y. 2009) (denying a
Section 2255 motion because the "[movant]'s statements at his
plea allocution control over his current, conclusory
statements that counsel was ineffective"). Because statements
made at a plea allocution "carry a strong presumption of
verity," Blackledge v. Allison, 431 U.S. 63, 74 (1977),
"unsupported allegations" that contradict a prior statement
made under oath are not enough to render a plea involuntary,
United States v. Gonzalez, 970 F.2d 1095, 1100-01 (2d Cir.
1992); see also Gutierrez v. United States, No. 02 CR 1312,
2005 WL 2207026, at *4 (S.D.N.Y. Sept. 6, 2005) ("Petitioner's
uncorroborated assertion that he was induced to plead guilty

by his attorney's false promise is not enough to overcome the presumption of voluntariness created by his sworn statements to the Court during his plea allocution."). Furthermore, Rensing explains that he was in part rushed into the plea agreement because of his own medical condition. Of course, this circumstance has nothing to do with the alleged ineffectiveness of Mazurek's representation. Rensing does not claim, much less provide evidence, that Mazurek exploited this condition. Thus, the Court concludes that Mazurek's representation regarding the Plea Agreement did not fall below professional standards.

Lastly, Rensing's argument that trial counsel did not present mitigating circumstances to the Court at sentencing likewise fails. Mazurek submitted voluminous filings in connection with sentencing, including the report of a forensic psychologist and fifty-seven individual letters. (See "Rensing's Sentencing Submission," Dkt. No. 68.) Rensing has not provided any evidence regarding what the excluded letters would have said, and thus the Court cannot conclude that trial counsel's strategic judgment to include only fifty-seven letters, rather than the allegedly available ninety, constituted ineffective assistance.

    2. <u>Whether the Alleged Deficiencies Prejudiced Rensing</u>

Rensing's Motion also fails under the second prong of the Strickland test because Rensing has not established that any of Mazurek's alleged failures prejudiced Rensing.

With respect to the alleged investigative failures, Rensing essentially argues that Mazurek did not thoroughly explore and make use of (1) the legitimate value Streaming Media provided to Epix and, relatedly, (2) Epix management's awareness and authorization of Rensing's conduct. Neither of these circumstances would have rendered rejection of the Plea Agreement reasonable. For one thing, these circumstances do not refute the Government's overwhelming evidence that Rensing used stolen identities to facilitate the transfer of money from Epix to Rensing. Moreover, Rensing has not explained what new information further investigation would have uncovered. Thus, Rensing would have still faced criminal liability for his conduct, and the Court has no basis to conclude that further investigation of these issues would have made a difference in Rensing's decision to plead guilty.

Similarly, Rensing has not established that any of the "key witnesses" Mazurek did not interview would have provided new, helpful evidence. Even former Epix CEO Greenberg, who stated he felt bad that Rensing was charged with an $8.1 million fraud, did not negate any of the evidence that Rensing used the identities of several individuals without their

knowledge to facilitate payment from Epix to Rensing personally. In fact, when asked whether Rensing's quality work product at Epix could justify his conduct, Greenberg said such a notion was "ridiculous." (Protass Affirmation ¶ 7.) Without allegations that additional investigation would have uncovered unique and helpful information, the Court cannot conclude that, but for the alleged failures, the outcome of the case would have been different or that Rensing's decision to reject the Plea Agreement would have been reasonable.

Indeed, the Plea Agreement Mazurek negotiated was favorable to Rensing, especially because the Government agreed to dismiss the identity theft count, which carried a mandatory two-year, consecutive sentence. Furthermore, Mazurek negotiated a roughly $400,000 reduction of the restitution amount for legitimate expenses Epix paid to Streaming Media. Thus, the Court is not persuaded that any of Mazurek's alleged failures prejudiced Rensing in light of the compelling and unchallenged incriminating evidence against him and the favorable terms the Plea Agreement offered. See United States v. Garcia, 57 F. App'x 486, 489 (2d Cir. 2003) (citation omitted) (explaining that whether an alleged investigation failure prejudiced the defendant "will depend on the likelihood that discovery of the evidence would have

led counsel to change his recommendation as to the plea" which in turn "will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial").

Next, while Rensing insists that he would have benefitted from proffering with the Government and from providing the Government his server and passwords, he again fails to detail what new evidence would have emerged as a result, or how that new evidence would have made "a decision to reject the plea bargain . . . rational." Padilla, 559 U.S. at 372.

Moreover, even if Mazurek told Rensing that he could negotiate a sentence and forfeiture amount below the range and figure stipulated in the Plea Agreement, the court clearly explained otherwise at the plea hearing, and Rensing affirmed he understood. (See Plea Transcript at 10:15-19 ("[T]he decision as to the appropriate sentence in your case will be entirely up to the sentencing judge.").) Thus, any promise or misrepresentation by Mazurek about Rensing's sentence was corrected by the magistrate judge at the plea hearing, and Rensing acknowledged that he understood. Accordingly, no prejudice to Rensing could have resulted from Mazurek's alleged promise or misrepresentation. See, e.g., Marte v. United States, 952 F. Supp. 2d 537, 541 (S.D.N.Y. 2013) ("Even

if Marte's trial counsel failed to inform him of the deportation consequences, Marte fails to show prejudice because he affirmed his understanding of the deportation implications of his guilty plea during the plea allocution."); Catino v. United States, No. 00 Civ. 7226, 2001 WL 536928, at *8 (S.D.N.Y. May 21, 2001) ("[A]ny erroneous impression Catino may have had was sufficiently cured by the Court's explicit and repeated statements to the contrary.").

Lastly, the Court is not persuaded that Mazurek's alleged failure to present mitigating circumstances to the Court resulted in any prejudice at the sentencing phase. As previously noted, Mazurek did present mitigating circumstances to the Court and the Court acknowledged having received and reviewed them. Rensing's argument to the contrary is implausible and unconvincing. To the extent Rensing challenges Mazurek's decision to include fifty-seven support letters in his sentencing submission rather than ninety, Rensing has not explained what the additional letters would have said, and thus he has not established that "the result of the proceeding would have been different" but for counsel's failure to include the additional letters. Strickland, 466 U.S. at 694. To suggest that the Court would have imposed a lesser sentence had it reviewed any additional

letters of support for Rensing amounts to purely conclusory speculation.

Because the Motion fails to satisfy either prong of the Strickland test, it must be denied. The Court further concludes that, because Rensing has not made a "plausible claim" for relief, a hearing is not required to resolve the Motion. Morales v. United States, 635 F.3d 39, 45 (2d Cir. 2011) (quoting Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009)); see also Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011) (explaining that Second Circuit precedent allows courts to pursue a "'middle road' of deciding disputed facts on the basis of written submissions").

## IV.   **ORDER**

Accordingly, for the reasons stated above, it is hereby

**ORDERED**, that the motion by Emil Rensing ("Rensing") for relief under 28 U.S.C. § 2255 for ineffective assistance of counsel (Rensing v. United States, 19 Civ. 5674, Dkt. Nos. 1, 2; United States v. Rensing, 16 CR 442, Dkt. No. 96) is hereby **DENIED**; and it is further

**ORDERED**, that Rensing's request for a hearing on the motion is also **DENIED**.

**SO ORDERED.**

Dated:    New York, New York
         8 April 2021

                                    _____
                                         Victor Marrero
                                           U.S.D.J.